**CARTIER, INCORPORATED and Les Must de Cartier, Inc., Plaintiffs,**

v.

**The THREE SHEAVES CO., INC., Defendant.**

**No. 78 Civ. 5897 (RLC).**

United States District Court, S. D. New York.

Feb. 8, 1979.

---

Nims, Howes, Collison & Isner by Kenneth R. Umans, New York City, for plaintiffs.

Burns, Jackson, Miller, Summit & Jacoby by Herbert P. Jacoby, New York City, for defendant.

## OPINION

ROBERT L. CARTER, District Judge.

This is an action for preliminary injunction for trademark infringement under the Lanham Act, 15 U.S.C. § 1051 *et seq.* and for unfair competition under § 368–d of the General Business Law of New York (McKinney). The court has jurisdiction of the federal claims pursuant to 28 U.S.C. § 1338(a) and pendent jurisdiction of the state claims as well. Plaintiffs seek to enjoin defendant from using the mark Cattier or Pierre Cattier on its products on the ground that the defendant's trademark is so confusingly similar to plaintiffs' trademark Cartier, that the public is likely to be confused as to the source of defendant's products.

Plaintiff, Cartier, is a Delaware corporation with its principal place of business located at 653 Fifth Avenue, New York, New York. Plaintiff has operated a retail store in New York City continuously since 1908. The current location of its main store is at 52nd Street and Fifth Avenue in New York City, and it operates branch stores in Palm Beach and Bal Harbor, Florida; Houston, Texas; Detroit, Michigan; Atlanta, Georgia and San Francisco, California. Plaintiff's retail merchandise is sold at the above locations and through authorized retail outlets throughout the United States. Plaintiff, Cartier, is engaged in the design, manufacture and sale in interstate and foreign commerce of jewelry, watches, sterling silver, crystal, chinaware, luggage and leather goods, pens and stationery, perfume bottles and flasks, and containers for lipstick and powder. Cartier has made plans to market a perfume under its trademark. It is the owner of a number of registrations for its Cartier trademark: Reg. # 411,975 issued on February 23, 1945 and # 759,201 issued October 29, 1963, covering watches, clocks, wriststraps and bracelets; Reg. # 411,239 and # 411,240 both issued on January 9, 1945 covering jewelry, perfume bottles, toilet articles, mesh bags and holders for cosmetics. Those registrations are currently outstanding and in force.

Plaintiff, Les Must de Cartier, is also a Delaware corporation with its principal place of business located at 16 East 52nd Street, New York, New York. Les Must is licensed by Cartier to sell various merchandise bearing the Cartier trademark to dealers authorized to sell Cartier products.

During the last six years Cartier has spent in excess of $1,500,000 advertising its products, and its trademark has become associated with expensive high quality merchandise.

Defendant, Three Sheaves, Inc., is a young New York corporation formed in 1972, with its principal place of business located at 100 Varick Street, New York, New York. Its president and principal, if not sole stockholder, is George Abehsera who some 8 or 9 years ago came to this country from France. He had begun his business career by operating a health food store in Paris, and when he came to New York, he opened several macrobiotic restaurants in Greenwich Village. These restaurants have no connection with the corporate defendant. Abehsera decided to go into cosmetics, and in 1973 he entered into a licensing agreement with a French enterprise called La Vie Establissement Cattier-Aliome. It produces clay based toothpaste, masks, night creams, soaps, shampoos and moisturizers, and Three Sheaves was given an exclusive license to sell these products in Sweden, Holland, England and the United States. The agreement was for a three year term, renewable for the same period except if notice were given within six months after its initial expiration of a desire to discontinue the agreement. There is no mention of Pierre Cattier in the 1973 licensing agreement, but plaintiff sold products covered by the agreement under the brand name Pierre Cattier La Vie Saine.

In 1977, a new agreement was entered into. This time the licensor was Pierre Cattier, S.A. Two contracts were introduced, both signed by Jean de Kochko, as chief executive of Pierre Cattier, S.A. and by Abehsera as president of Three Sheaves. One contract is a two page document granting defendant the exclusive right for a period of 15 years to use the name Pierre Cattier or Cattier on products manufactured and sold by defendant in North or South America, Australia, Canada and Israel. Defendant is given sole responsibility for the manufacture of products bearing the Cattier or Pierre Cattier trademark in the assigned territory. A schedule of pay-ments from defendant to the French company is set out in the contract, and the agreement provides that all matters not mentioned are to be governed by the international code. Exhibits of this contract in both French and English were introduced.

A second contract in English was also introduced as an exhibit. It has the same date, November 9, 1977, is signed by the same parties, contains the same schedule of payments, includes a grant of exclusivity in the same territory for a 15 year term, and generally covers the same ground as the two page document, but it also contains provisions not in the shorter agreement. It licenses Three Sheaves to use the Pierre Cattier and Cattier names in conjunction with the manufacture, sale and distribution of the licensor's cosmetics and any products Three Sheaves in its discretion decides to manufacture, sell or distribute in the assigned territory. The licensee agrees to maintain in its manufacture of these products the same standard the licensor maintains. There are provisions covering bankruptcy, and no mention is made of the international code. In addition, although the document is signed by Kochko and Abehsera, there is a handwritten statement in French signed by P. Cattier which says, I believe, that the licensee is entitled to all profits in the territory assigned and the licensor is entitled to all profits in all other areas.

As indicated, defendant at first sold its products under the mark Pierre Cattier La Vie Saine. Then, it began to use Cattier alone in connection with the packaging, promotion, sale and distribution of its merchandise more frequently. However, since its present counsel entered the picture about six months ago, defendant on their advice has begun to rely more heavily on Pierre Cattier as its principal trademark. Abehsera testified that he would use Pierre Cattier exclusively after the inventory bearing the Cattier trademark has been exhausted.

Exhibits introduced at the hearing on the preliminary injunction show that defendant

has been using the trademarks Cattier and Pierre Cattier in a variety of ways. Soaps are marketed as Pierre Cattier products, but "Pierre" is ¼ or less the size of "Cattier." Powders (rose, green and white clay) are also marketed as Pierre Cattier products but both names are the same size on these items. A talcum powder is packaged under Cattier, and a dusting powder under Pierre Cattier, but here the "Pierre" is diminutive while the "Cattier" appears in huge letters. Cleansing masks, toothpaste, stick deodorant and shampoo are packaged under the Cattier label.

Defendant's main source for distribution of its products at present are health food stores and health food distributors. It has, however, sold some products to Macy's department store under the Cattier label. Its sales volume has roughly doubled each year, and hence it is logical to anticipate that in an expanding market, defendant is likely to seek outlets outside the limits of the health food market and expand into areas where plaintiffs' products are sold.

Defendant's gross sales volume was 18–20 thousand dollars in 1973; 45–50 thousand dollars in 1974; 110 thousand dollars in 1975; 240 thousand dollars in 1976; 410–420 thousand dollars in 1977 and 835 thousand dollars in 1978. Defendant's advertising expenditures rose rather spectacularly in 1978. 10 thousand dollars were spent on advertising in 1975; 11 thousand dollars in 1976; 28 thousand dollars in 1977; and 250 thousand dollars in 1978.

In 1976, defendant became responsible for the manufacturing of all its products. This is accomplished by contracting out to other concerns: to Hewlett Soap Co. in Ohio for soaps, to Allen Last in Dobbs Ferry for shampoos, to Ryster Co. in New Jersey for toothpaste, to Halcyon Co. to mix its powders and to the Natural Living Co. in Northbridge, California for its deodorants. The various containers and boxes in which the products are packaged and are also made under contract by third parties.

Defendant's prices are modest, ranging from $1.75 to $5.00. Recently, plaintiffs became aware of defendant's use of the Cattier and Pierre Cattier trademarks because defendant and the Cattier and Pierre Cattier products had begun to obtain considerable newspaper and magazine coverage by 1977 and especially in 1978. On August 11, 1977, the New York Times published what appears to be an advertisement of defendant's products. Vogue carried an advertisement of Pierre Cattier products in its January, 1978 issue. Women's Wear Daily carried a feature story on Abehsera and defendant's products in its May 12, 1978 issue. Articles have also appeared in 1978 in Harpers Bazaar, Viva, Mademoiselle and Beauty Fashion.

*Discussion*

Since the law of trademark infringement is an aspect of the law of unfair competition, *S. C. Johnson & Son, Inc. v. Johnson,* 175 F.2d 176, 178 (2d Cir.), *cert. denied,* 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527 (1949), and the principles governing disposition of claims of trademark infringement generally apply to issues of unfair competition, attention will be focused solely on trademark infringement. A full discussion of the local law of unfair competition may, I believe, be safely postponed until the trial on the merits.

The purpose of the trademark law is to protect the public from confusion and deception which results from copying trademarks which through their distinctiveness or exclusivity identify the origin of the marked goods. *W. E. Bassett Co. v. Revlon, Inc.,* 354 F.2d 868, 871 (2d Cir. 1966); *Nature's Bounty, Inc. v. Basic Organics,* 432 F.Supp. 546 (E.D.N.Y.1977). Trademark rights are developed through use, see *Armstrong Cork Co. v. Armstrong Plastic Covers Co.,* 434 F.Supp. 860, 870 (E.D.Mo.1977); *Time Mechanisms, Inc. v. Qonaar Corp.,* 422 F.Supp. 905 (D.N.J.1976). The purpose of the registration scheme is not to create rights, but to allocate the burden in the trial of an action for infringement, *Miller Brewing Co. v. G. Heileman Brewing Co.,* 427 F.Supp. 1192, 1198 (W.D.Wis.); 427 F.Supp. 1204 (W.D.Wis.) *rev'd on other grounds,* 561 F.2d 75 (7th Cir. 1977). Own-

ership of a registered trademark creates a presumption of its validity, *National Automobile Club v. National Auto Club, Inc.*, 365 F.Supp. 879, 882 (S.D.N.Y.1973) (Carter, J.), and the plaintiff's exclusive right to use the mark in commerce. Registration further creates a rebuttable presumption that the mark is suggestive, arbitrary or fanciful rather than merely descriptive. *See Abercrombie & Fitch Co. v. Hunting World*, 537 F.2d 4, 11 (2d Cir. 1976).

■ There is no trademark right in gross, *American Steel Foundries v. Robertson*, 269 U.S. 372, 46 S.Ct. 160, 70 L.Ed. 317 (1926); *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141 (1918); *B & L Sales Associates v. H. Daroff & Sons, Inc.*, 421 F.2d 352 (2d Cir. 1970); and a trademark must be appurtenant to an established business. *Capital Temporaries, Inc. of Hartford v. Olsten Corp.*, 506 F.2d 658, 663 (2d Cir. 1974). Yet it has been the law of this circuit since *Yale Electric Corp. v. Robertson*, 26 F.2d 972 (2d Cir. 1928), that a trademark owner has the right to protection against third parties using a similar mark on related non-competing goods. *See, e. g., Scarves by Vera, Inc. v. Todo Imports, Ltd.*, 544 F.2d 1167 (2d Cir. 1976).

■ The likelihood of confusion is the critical determinant, and prior decisions based on different facts and different marks generally offer little specific guidance in an instant case. *Jaquet-Girard S.A. v. Girard Perregaux & Cie., S.A.*, 423 F.2d 1395, 57 C.C.P.A. 996 (1970). Each case must be decided on its own facts. *American Foods, Inc. v. Golden Flake, Inc.*, 312 F.2d 619, 627 (5th Cir. 1963).

■ There is no question but that plaintiffs' trademark is a strong mark entitled to protection. The yardsticks to be applied in determining an issue of trademark infringement are set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), and expanded upon in *Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531, 536 (2d Cir. 1964) and *King Research, Inc. v.*

*Shulton, Inc.*, 454 F.2d 66, 68–69 (2d Cir. 1972). These include the strength of the mark, the degree of similarity between the two marks, the likelihood that the owner of the mark will bridge the gap, actual confusion, the defendant's good faith in adopting its mark, the quality of defendant's product, sophistication of the buyer, and severe harm to defendant against small gain to the plaintiff. These standards must be applied here in the context of the legal requirements for entitlement to injunctive relief: probability of success on the merits and irreparable injury or sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tipping decidedly towards the party seeking relief. *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 250 (2d Cir. 1973). Even under the serious questions criterion the possibility of irreparable injury must be established. *Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1359 (2d Cir. 1976).

■ Plaintiffs' mark is strong, and over the years their mark has been associated with high quality products, more or less targeted for an exclusive clientele. Cartier is about to enter the cosmetic field in which the defendant is operating by marketing a perfume. The name Cattier is strikingly similar to plaintiffs' prestigious mark, Cartier. While there has been no evidence of actual confusion, the likelihood of confusion is all that is required. *Volkswagenwerk Aktiengesellschaft v. Rickard*, 492 F.2d 474, 478 (5th Cir. 1974). Defendant's products are inexpensive, and continued use of the mark Cattier or Pierre Cattier creates a likely source of confusion with plaintiffs' mark and gives the consuming public the impression that Cartier is now the source of inexpensive rather than high priced and high quality merchandise, thereby diluting plaintiffs' mark.

■ Defendant's chief argument for continued use of at least the Pierre Cattier mark is that this is the name of a real person. That has not been established to my satisfaction on this record. Pierre Cat-

tier came into the picture only in 1977 after defendant had been gaining a steadily expanding market by use of that mark and the mark Cattier between 1973 and 1977. La Vie Saine et Cattier-Aliome suddenly became transformed in Pierre Cattier, S.A. In any event, the use of one's own name commercially may be limited. *Lane Bryant, Inc. v. Maternity Lane, Ltd.,* 173 F.2d 559, 564 (9th Cir. 1949). One's own name must be used commercially in good faith and not so as to represent the goods sold thereunder to be that of another. The names need not be identical; it is sufficient if they are similar enough to create a likelihood of confusion. *Ibid. Accord L. E. Waterman Co. v. Modern Pen Co.,* 235 U.S. 88, 35 S.Ct. 91, 59 L.Ed. 142 (1914); *Brooks Clothing of Calif. v. Brooks Brothers,* 158 F.2d 798 (9th Cir. 1947).

Defendant cited a series of cases, *Thaddeus Davids Co. v. Davids,* 233 U.S. 461, 34 S.Ct. 648, 58 L.Ed. 1046 (1914); *L. E. Waterman Co. v. Modern Pen Co., supra; Taylor Wine Co. v. Bully Hill Vineyards,* 569 F.2d 731 (2d Cir. 1978); *S. C. Johnson & Sons v. Johnson, supra;* and *David B. Findlay, Inc. v. Findlay,* 18 N.Y.2d 12, 271 N.Y. S.2d 652, 218 N.E.2d 531, *cert. denied,* 385 U.S. 930, 87 S.Ct. 289, 17 L.Ed.2d 212 (1966) for the proposition that continued use of one's own name must be permitted, although precautions may be ordered, if necessary. As was stated in one of the cases cited by defendant, "[t]he present trend in the law is to enjoin the use even of a family name when such use tends or threatens to produce confusion in the public mind." *David B. Findlay, Inc. v. Findlay, supra,* 18 N.Y.2d at 19, 271 N.Y.S.2d at 655, 218 N.E.2d at 534.

We have no evidence that Pierre Cattier is actually using that name in France or elsewhere. Defendant was content at the outset to market his product under the mark Pierre Cattier La Vie Saine. Suddenly a licensor appears under the name Pierre Cattier, S.A. The extent and use of the name in France is unknown.

Moreover, the license to defendant would appear to transfer no rights to him because it is defective in that it contains no provision for quality control by the licensor. Under such circumstances, the license has been held to be void as against public policy. *See Heaton Distributing Co. v. Union Tank Car Co.,* 387 F.2d 477 (8th Cir. 1967); *Dawn Donut Co. v. Hart's Food Stores, Inc.,* 267 F.2d 358 (2d Cir. 1959); *Acme Valve & Fittings Co. v. Wayne,* 386 F.Supp. 1162 (S.D.Tex.1974). While there is a phrase in one of the 1977 contracts in which the licensee covenants to maintain the same standard as the licensor, the licensee is given carte blanche to manufacture any kind of product and to use Cattier and Pierre Cattier thereon. These factors strengthen plaintiffs' claim for injunctive relief.

On the present record, plaintiffs have clearly established probability of success on the merits and irreparable injury. Moreover, even using the alternative standard, the equities favor injunctive relief. The similarity of the two names, the nature of defendant's product, and the process of their manufacture make the possibility of irreparable harm to plaintiff Cattier's reputation acute. Products are being marketed with a mark strikingly similar to plaintiffs' mark. The quality of the goods is such that serious damage to plaintiffs' reputation for quality merchandise carefully built over the years may be damaged. The balance of hardship is decidedly in plaintiffs' favor.

On the issue of laches, defendant's widespread use of Cattier or Pierre Cattier is a relatively recent phenomenon, and a party can be accused of laches only if it fails to act after notice. Plaintiffs sought relief as soon as they became aware of defendant's existence.

The motion for preliminary injunction is granted.

SETTLE ORDER.